**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 24-CR-378 (TNM)** |
| **FREDDIE LEE HALL, JR.,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**PRETRIAL DETENTION OF DEFENDANT FREDDIE LEE HALL, JR.**

Between April and August 2024, the defendant, Freddie Lee Hall, Jr., distributed approximately 841.1 grams of crack cocaine to an ATF confidential informant.  A federal grand jury returned an indictment charging the defendant with 13 counts of unlawful distribution of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  On August 22, 2024, ATF Special Agents arrested the defendant in Washington, D.C., and found him to be in possession of approximately 18.8 grams of presumptive crack cocaine; multiple Ziploc-style bags, both containing suspected marijuana and empty; a scale; and multiple mylar bags containing cannabis-infused gummies and related substances.  Special Agents also searched his Maryland residence and recovered a cache of guns and drugs: seven firearms; approximately 17 firearm magazines; nearly 1,400 rounds of ammunition; other firearms parts and paraphernalia; body armor; approximately 586.3 grams of presumptive cocaine powder; approximately 158.5 grams of presumptive crack cocaine; approximately two pounds of suspected mushrooms; scales; drug packaging materials and paraphernalia; and nearly $62,000 in cash.

The United States respectfully submits this memorandum in support of its motion that the remain detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(C), (D) & (E).  The defendant poses an unmitigable danger to the community, and this Court should detain him pending trial.

**Factual Background**

In March 2024, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began investigating the unlawful trafficking of controlled substances by the defendant, Freddie Lee Hall, Jr., from District Heights, Maryland, into the District of Columbia.  During the course of the investigation, an ATF Confidential Informant[1] (the "CI") conducted 13 controlled purchases of cocaine base (commonly "crack cocaine") from the defendant in the District of Columbia.

*ATF's Verification of The Defendant's Residence and Vehicles*

During the investigation, ATF Special Agents confirmed the defendant's association with a residence in District Heights, Maryland, and two vehicles—a 2012 Chevrolet Tahoe and a 2018 Lexus LS.  Multiple data points tie the defendant to the Maryland residence.  A query of the Maryland Department of Assessments and Taxation's online database shows that the residence has been owned by the defendant and his father since March 2021.  In addition, ATF Special Agents installed a pole camera with a view of the residence and its driveway and have also conducted physical surveillance there.  ATF Special Agents consistently observed the defendant at the residence throughout the course of the investigation, including on the same day as each of the 13 controlled purchases.  In addition, the defendant provided the residence's address to T-Mobile;

---

[1] An ATF Confidential Informant (the "CI") was used during this investigation.  The CI was shown to be reliable to law enforcement.  The CI never knowingly made any statements known to be untruthful to your affiant and other agents involved in this investigation.  The information that the CI provided was corroborated, to the extent possible, through surveillance and controlled purchases of narcotics.  The CI was compensated by law enforcement for the assistance that they provided.  The CI has a criminal history that includes felony narcotics and forgery convictions.  Specifically, the CI was found guilty of possession of cocaine in September 1988, failure to appear in January 1993, passing a bad check in January 1995, contempt of court in May 1996, carrying a concealed weapon in December 1996, forgery in June 1997, distribution of cocaine in July 1997, possession of cocaine in July 1997, failure to appear in a misdemeanor case in April 2000, and trespassing in September 2001.

mail addressed to him was found in the residence's trash; and both of the defendant's vehicles were registered to him at the residence and observed there.

### *The Controlled Purchases*

The CI met with ATF prior to each controlled purchase in this investigation.  ATF Special Agents searched the CI and verified that the CI was not carrying any drugs, firearms, or contraband.  The CI was given recorded ATF funds and equipped with recording devices.  The recording devices included an audio transmitter, which allowed ATF Special Agents to listen to the transaction in real time, and a video camera, which recorded both video and audio that could be retrieved after the fact.  ATF Special Agents also maintained physical surveillance of the CI on the way to and from the controlled purchases and, to the extent possible, during the purchases.  Following each purchase, the CI met with ATF, turned over purchased controlled substances and recording devices, and was searched and found to be free of contraband.  The CI was financially compensated for participating in the purchases.

### *April 3, 2024, Controlled Purchase (Count One)*

On April 2, 2024, the CI spoke with the defendant by phone.  They agreed to meet in the parking lot of the Giant Food grocery store, located at 1535 Alabama Avenue Southeast, in Washington, D.C., the following day so that the CI could purchase a half ounce (or a "14," meaning 14 grams) of crack.  (The Giant parking lot was the designated meeting spot for all 13 of the controlled purchases, and all but one controlled purchase took place there as planned.)

On April 3, 2024, Special Agents observed the defendant leaving his residence in his Chevrolet Tahoe, and he arrived at the Giant parking lot driving the same vehicle.  At approximately 3:23 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 14.7 grams of crack cocaine from him, as depicted below.  The suspected

crack cocaine field-tested positive, and laboratory confirmation by the Drug Enforcement Administration (DEA) Laboratory remains pending.



*April 17, 2024, Controlled Purchase (Count Two)*

On April 15, 2024, the CI spoke with the defendant by phone and arranged to meet up two days later, this time to purchase one ounce of crack for $900.

On April 17, 2024, ATF Special Agents observed the defendant leaving his residence in his Lexus LS, and he arrived at the Giant parking lot driving the same vehicle.  At approximately 3:34 p.m., the defendant got into the CI's vehicle, and the CI purchased approximately 29.2 grams of crack cocaine from him, as depicted below.  The suspected crack cocaine field-tested positive, and laboratory confirmation by DEA remains pending.



***April 19, 2024, Controlled Purchase (Count Three)***

On April 18, 2024, the CI spoke with the defendant by phone and arranged to meet up the following day to purchase two ounces of crack for $1,800.

On April 19, 2024, ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle. At approximately 12:19 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 57.5 grams of crack cocaine from him, as depicted below. The suspected crack cocaine field-tested positive, and laboratory confirmation by DEA remains pending.



***April 25, 2024, Controlled Purchase (Count Four)***

On April 24, 2024, the CI spoke to the defendant by phone and arranged to meet up the following day to purchase two ounces of crack for $2,000.

On April 25, 2024, ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle. At approximately 1:29 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 57.1 grams of crack cocaine from him, as depicted below. The suspected crack cocaine field-tested positive, and laboratory confirmation by DEA remains pending.



***April 26, 2024, Trash Pull by ATF Special Agents***

On April 26, 2024, at approximately 3:15 a.m., ATF Special Agents pulled the defendant's trash, having watched it being put out earlier in the evening.  The agents took the trash from the defendant's garbage can to the ATF Washington Field Division, in Washington, D.C., to examine its contents.  In the trash, Special Agents found: a clear package with a slight pink tint that had white powder residue covering the inside; a clear package that had white powder residue covering the inside; and multiple pieces of mail addressed to the defendant at the residence.  Special Agents conducted a preliminary field test of the two packages with white powder residue, which yielded a positive result for cocaine hydrochloride.  DEA subsequently conducted lab testing of the packages and identified cocaine in both.



6

***April 29, 2024, Controlled Purchase (Count Five)***

On April 28, 2024, the CI spoke to the defendant by phone and arranged to meet up the following day to purchase two ounces of crack.  During this call, the defendant mentioned that he was currently in North Carolina and would need to see if he could get back in time to catch his supplier and "get things taken care of."  The defendant told the CI he would call back to confirm.

On April 29, 2024, the CI called the defendant to see if the deal was still on for later that day.  The defendant stated that he was going to "grab it in a little bit" and agreed to meet the CI around 2:00 p.m. that day.  At approximately 1:32 p.m., the CI called the defendant.  During that call, the defendant asked if the CI had sent a text message he had sent earlier.  The text message said "24," meaning $2,400 for the crack.  The CI confirmed receipt of the text.  ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle.  The defendant left the parking lot without getting out of his car.  He asked the CI to meet him in in the 1800 block of Savannah Street Southeast because there was too much going on in the lot, and the CI traveled to that location.  At approximately 3:21 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 57.1 grams of crack cocaine from him, as depicted below.  The suspected crack cocaine field-tested positive, and laboratory confirmation by DEA remains pending.



***May 23, 2024, Controlled Purchase (Count Six)***

On May 16, 2024, the CI spoke to the defendant by phone to arrange a purchase for the following week.  On May 22, 2024, the CI spoke to the defendant again and arranged to meet up the following day to purchase two ounces of crack.  The defendant told the CI he would need to call back to confirm the price because he had not seen his source since returning from vacation.

On May 23, 2024, the defendant confirmed the price was the same as the previous deal, that is, $1,200 an ounce.  ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle.  At approximately 5:39 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 54.9 grams of crack cocaine from him, as depicted below.  The suspected crack cocaine field-tested positive, and DEA lab testing has confirmed that the substance is cocaine base. While standing outside the CI's vehicle, the defendant told the CI he would be willing to drive closer to where he believed the CI lived because he already drives south to sell marijuana.



***May 29, 2024, Controlled Purchase (Count Seven)***

On May 27, 2024, the CI spoke to the defendant by phone and arranged to meet up two days later to purchase two ounces of crack.

On May 29, 2024, ATF Special Agents observed the defendant leaving his residence driving his Lexus, and he arrived at the Giant parking lot driving the same vehicle.   At approximately 5:09 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 57.0 grams of crack cocaine from him, as depicted below.  While in the vehicle, the defendant told the CI that the weight of the product can vary depending on what happens when the product is put together.  He also stated that he wanted to continue doing business. The suspected crack cocaine field-tested positive, and DEA lab testing has confirmed that the substance is cocaine base.



*June 5, 2024, Controlled Purchase (Count Eight)*

On June 3, 2024, the CI spoke to the defendant by phone and arranged to meet up two days later to purchase two ounces of crack.

On June 5, 2024, ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle.  At approximately 5:41 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 57.9 grams of crack cocaine from him, as depicted below.  During the purchase, the defendant told the CI that he travels to North Carolina approximately once a month to take marijuana to a friend.  The CI and the defendant discussed purchasing a larger quantity of crack

on the next deal and that he would need to discuss pricing with his source.  The defendant stated he picked it up and put it together but did not make a lot of money from it.  After the purchase, the defendant went to his Tahoe and retrieved a sample of marijuana for the CI.  The suspected crack cocaine field-tested positive, and DEA lab testing has confirmed that the substance is cocaine base.



*June 12, 2024, Controlled Purchase (Count Nine)*

On June 10, 2024, the CI spoke to the defendant by phone and arranged to meet up two days later to purchase three ounces of crack.  On June 11, 2024, the defendant told the CI that the price would be the same, that is, $1,200 an ounce.

On June 12, 2024, ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle.   At approximately 5:07 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 85.5 grams of crack cocaine from him, as depicted below.  The suspected crack cocaine field-tested positive, and DEA lab testing has confirmed that the substance is cocaine base.



*June 26, 2024, Controlled Purchase (Count Ten)*

On June 25, 2024, the CI spoke with defendant by phone and arranged to meet up the following day to purchase three ounces of crack.

On June 26, 2024, ATF Special Agents observed the defendant leaving his residence driving his Lexus, and he arrived at the Giant parking lot driving the same vehicle.   At approximately 5:02 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 83.9 grams of crack cocaine from him, as depicted below.  The suspected crack cocaine field-tested positive, and laboratory confirmation by DEA remains pending.



*July 10, 2024, Controlled Purchase (Count Eleven)*

On July 8, 2024, the CI spoke to the defendant by phone and arranged to meet up two days later to purchase three ounces of crack.

On July 10, 2024, ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle.  When the defendant was observed leaving his residence, he was carrying a white package and what appeared to be a black plastic sack.  At approximately 5:26 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 87.0 grams of crack cocaine from him, as depicted below.  The defendant retrieved the crack cocaine from the black plastic sack.  During the purchase, the defendant asked the CI about the marijuana he had given the CI as a sample during the June 5, 2024, transaction.  The defendant asked the CI how much the CI was paying for marijuana and said he could offer a better price.  He also showed the CI a photograph on his phone of "snow caps," which is a type of marijuana that he said he had available for sale.  The suspected crack cocaine field-tested positive, and laboratory confirmation by DEA remains pending.



*July 25, 2024, Controlled Purchase (Count Twelve)*

On July 23, 2024, the CI spoke with the defendant by phone and arranged to meet up two days later to purchase three ounces of crack.

On July 25, 2024, ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving the same vehicle.  At approximately 5:15 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 85.3 grams of crack cocaine from him, as depicted below.  Before completing the transaction, the defendant expressed concern to the CI about a man who was sitting in a vehicle across the parking lot.  The defendant said he always pays attention to his surroundings and remarked, "This shit ain't legal."  The suspected crack cocaine field-tested positive, and laboratory confirmation by DEA remains pending.



*August 15, 2024, Controlled Purchase (Count Thirteen)*

On August 13, 2024, the CI spoke with the defendant by phone and arranged to meet up two days later to purchase three ounces of crack.  The following day, the CI asked the defendant if the CI could get "one extra," meaning four ounces of crack.  The defendant agreed.

On August 15, 2024, ATF Special Agents observed the defendant leaving his residence driving his Tahoe, and he arrived at the Giant parking lot driving he same vehicle.  At approximately 5:52 p.m., the defendant got into the passenger seat of the CI's vehicle, and the CI purchased approximately 114.0 grams of crack cocaine from him, as depicted below.  The

suspected crack cocaine field-tested positive, and submission to the DEA for lab testing remains pending.



*The Defendant's August 22, 2024, Arrest*

On the morning of August 22, 2024, ATF Special Agents arrested the defendant in the District of Columbia while he was on his way to work.  The defendant and his vehicle were searched pursuant to a search warrant issued by this Court in case number 24-SW-271.  At the time of his arrest, the defendant had a container of approximately 18.8 grams of suspected crack cocaine in his left hand, $604 in cash in his front right pocket, and three cell phones.  In his car, the defendant had a blue fanny pack containing four mylar bags of cannabis-infused gummies; a black backpack containing multiple Ziploc-style sandwich bags containing marijuana, multiple mylar bags of cannabis-infused gummies and related substances, multiple empty Ziploc-style bags, and a scale; nine multicolored pills (substance currently unknown); and a cannabis-infused "Hershey's" bar.

*The August 22, 2024, Residential Search Warrant Execution*

ATF Special Agents also searched the defendant's residence in District Heights, Maryland, pursuant to a search warrant issued by the United States District Court for the District of Maryland in case number 24-MJ-01682.

At the time of the search warrant execution, the defendant's significant other and their 12-year-old son were at home.  (Although the defendant's father is listed as a co-owner of the home, he does not live at the residence.)  The defendant's significant other stated that the basement was the defendant's area.  She also informed Special Agents that the defendant had a gun concealed on top of an air duct in the basement and that there was a shotgun behind the master bedroom door.  In total, Special Agents recovered seven firearms:  five from a safe in the basement; one from above the air duct in the basement; and one from behind the master bedroom door.  Photos of the recovered firearms are included below.



*Loaded 9-millimeter pistol (from safe)*



*Loaded Ruger P89 9-millimeter pistol (from safe)*



*Loaded Taurus GX4 9-millimeter pistol with obliterated serial number (From safe)*



*Ruger P95 (in box) with loaded magazine (from safe)*



*Loaded American Tactical AR pistol with obliterated serial number (from safe)*



*Loaded Ruger LC9 9-millimeter pistol (from on top of basement air duct)*



*Panzer BP12 12-gauge shotgun (from master bedroom)*

As mentioned above, five firearms were recovered from a safe, which is depicted below.



In addition to the recovered firearms, Special Agents recovered approximately 17 firearm magazines of assorted types (e.g., pistol, extended, drum, rifle, shotgun); nearly 1,400 rounds of ammunition; various other firearm parts and paraphernalia; and body armor.

Special Agents also recovered substantial evidence of drug trafficking. This includes a large quantity of marijuana; approximately 586.3 grams of presumptive cocaine powder;

approximately 158.5 grams of presumptive crack cocaine; approximately 2 pounds of suspected mushrooms; drug packaging material; scales; a money counter; and nearly $62,000 in cash.





There was also evidence that the defendant manufactures crack in the basement, consistent with the powder cocaine recovered during the search and the April 26, 2024, trash pull. Next to the safe was a microwave, gloves, and baking soda. In addition, Special Agents observed what appeared to be freshly made crack cocaine drying on paper towels on a bed in a basement bedroom. Numerous articles of the defendant's clothing were observed in this bedroom.



*April 22, 2024, Custodial Interview*

After his arrest, the defendant waived his *Miranda* rights and spoke with ATF Special Agents. The defendant denied that he manufactured crack cocaine but admitted to selling it.

## Procedural History

On August 20, 2024, a federal grand jury empaneled by this Court returned an indictment charging the defendant with 13 counts of unlawful distribution of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

(ECF No. 1).  The same day, the Honorable G. Michael Harvey issued an arrest warrant.  The case has been assigned to the Honorable Trevor N. McFadden.

On August 22, 2024, the defendant was arrested.  On August 23, 2024, the defendant made his initial appearance before this Court and was ordered detained pending a detention hearing scheduled for Wednesday, August 28, 2024.  *See* 18 U.S.C. § 3142(f)(1)(C), (D) & (E).  The government now respectfully submits this Memorandum in Support of Pretrial Detention.

<u>**Applicable Legal Standard**</u>

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community," the Court shall order the defendant held pending trial.  18 U.S.C. § 3142(e).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).  As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466 (D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  *See* 18 U.S.C. § 3142(g).

Here, because the charged controlled substance offenses are punishable by up to 20 years' imprisonment, and because there is probable cause to believe the defendant has violated 18 U.S.C.

§ 924(c)(1)(A)(i), "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A)-(B). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n.2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C.

Cir. 1996).  Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).  A pretrial detention hearing should not be used as a discovery device.  *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

<u>**Argument**</u>

For reasons that follow, the defendant cannot rebut the presumption that there are are no conditions of release adequate to reasonably assure community safety were he to be released.  This Court should order him detained pending trial.

### A.  Nature and Circumstances of the Charged Offense

The first factor, the nature and circumstances of the offense, favors detention.  The defendant "has been indicted for serious narcotics trafficking charges," and even in those cases where "the alleged crimes do not involve weapons or violence, the offense triggers a statutory presumption of detention."  *United States v. Holroyd*, No. 17-CR-234 (TNM), 2018 WL 294529, at *2 (D.D.C. Jan. 4, 2018) (McFadden, J.) (citing 18 U.S.C. § 3142(e)(3)(A)).

Distributing crack cocaine is "a serious offense that begets violence and poisons the community."  *United States v. Jackson*, 468 F. Supp. 3d 59, 69 (D.D.C. 2018) (McFadden, J.).  Cocaine is destructive due to its "strong addictive potential."  *Dep't of Justice / Drug Enforcement Admin.*, Drug Fact Sheet: Cocaine (Oct. 2022), https://www.dea.gov/sites/default/files/2023-03/Cocaine%202022%20Drug%20Fact%20Sheet.pdf.  Smoking cocaine—the way crack is ingested—causes a quicker high because the substance reaches the brain "in seconds."  *Id.* "Cocaine users often binge on the drug until they are exhausted or run out of cocaine."  *Id.*  In

addition, "[t]aking high doses of cocaine or prolonged use, such as binging, usually causes paranoia," and the crash following cocaine use leaves users "craving to use cocaine again." *Id.*

In addition to the fact that crack destroys the lives of the people who become addicted to it, drug distribution is dangerous because it is inherently violent.  For obvious reasons, drug dealers cannot rely on law enforcement or the legal system, so they must defend themselves and resolve disputes through the actual or threatened use lethal force.  Given that they operate outside the protection of law, drug dealers are also prime targets for robberies, which heightens the risk of lethal force being used by everyone involved.

It thus comes as no surprise that the defendant was found to have small arsenal in his home, keeping seven guns and nearly 1,400 rounds of ammunition alongside his drug operation.  The defendant possessed an overwhelming amount of firepower.  As a threshold matter, judges of this Court have repeatedly recognized that, even in the absence of drug activity, possession of a loaded handgun is an inherently dangerous act that places the community at risk.  *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").  In the hands of those who are dealing drugs, however, guns pose an even greater risk to community safety.  *See, e.g.*, *Muscarello v. United States*, 524 U.S. 125, 132 (1998) (recognizing the "dangerous combination" of "drugs and guns") (quoting *Smith v. United States*, 508 U.S. 223, 240 (1993)).

Here, there is evidence that the defendant manufactures crack, and he trafficked approximately 841.1 grams of it to just one ATF informant.  At the time of his arrest, he had

approximately 18.8 grams of crack on his person, and a substantial quantity of additional drugs at his home—including approximately 586.3 grams of presumptive cocaine powder and 158.5 grams of presumptive crack.  *See Holroyd*, 2018 WL 294529, at \*2 (finding that approximately 20 grams of cocaine recovered from the defendant's apartment was a "substantial quantity" that weighed in favor of detention).  On top of that, the defendant—a convicted felon—possessed seven firearms and thousands of rounds of ammunition in furtherance of his drug trafficking activity.  The nature and circumstances of the offense therefore weigh in favor of detention.

### B.  The Weight of the Evidence Against the Defendant

The second factor, the weight of the evidence, also weighs in favor of detention.  Where, as here, "the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion."  *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018); *see also United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at \*10 (D.D.C. Feb. 6, 2023) (Howell, J.) ("[I]f the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true.").  All 13 drug transactions are recorded on video, and a large cache of guns and drugs were recovered from the defendant's home.  There is also evidence that the defendant manufactures crack in his residence.  In addition, the defendant has admitted to selling crack.  The weight of the evidence showing that the defendant unlawfully distributed crack is overwhelming.

### C.  The History and Characteristics of the Defendant

The third factor, the history and characteristics of the defendant, also weighs in favor of detention.  As set forth in the Pretrial Services Report, the defendant has a long criminal history, including two prior (albeit dated) felony drug trafficking convictions involving cocaine.  Given this criminal history, the defendant cannot rebut the presumption of dangerousness.  Indeed, even where a defendant has *no* criminal history, "the absence of criminal history alone cannot rebut the statutory presumption of dangerousness where the surrounding circumstances are so indicative of culpability." *United States v. Scott*, No. 24-CR-287 (DLF), 2024 WL 3887394, at *5 (D.D.C. Aug. 21, 2024).  While older convictions "do[] not carry the same weight as would more recent convictions," *Holroyd*, 2018 WL 294529, at *3, it is also evident that the defendant has been distributing significant quantities of crack and has been careful to avoid detection.  Indeed, the defendant told the CI during the July 25, 2024, controlled purchase that he is always aware of his surroundings because "[t]his shit ain't legal."

Moreover, the defendant's personal circumstances also weigh in favor of detention.  While the defendant will likely cite the support his family and seek release to home incarceration, the defendant was manufacturing and trafficking crack out of his home at the time of the offense.  His family was living with him there at the time.  Indeed, his significant other was aware—at a minimum—that there were multiple firearms in the house, as she directed ATF Special Agents to a handgun that was concealed on top of an air duct and a shotgun behind the master bedroom door.  The defendant's history and characteristics accordingly weigh in favor of detention.

### D.  The Nature and Seriousness of the Danger to the Community

The fourth factor, the nature and seriousness of the danger to the community, favors detention.  "The distribution of large quantities of narcotics into the community poses a significant

danger to communal safety." *Holroyd*, 2018 WL 294529, at *3.  In *Holroyd*, Judge McFadden found that the recovery of approximately 20 grams of crack cocaine from the defendant's residence gave rise to a "substantial risk" that the defendant "would introduce narcotics into the community if released."  *Id.*  That risk is even greater here, where the defendant had substantially larger quantities of cocaine in his house (approximately 586.3 grams of presumptive cocaine powder and 158.5 grams of presumptive crack), appears to have been manufacturing crack, and had a cache of loaded guns and ammunition.  Moreover, home incarceration would be insufficient to overcome the presumption and the weight of the statutory factors because "narcotics can be sold from one's home at any hour."  *Id.*  The nature and seriousness of the danger to the community therefore weighs in favor of detention.

## Conclusion

The defendant trafficked poison into the District of Columbia and had a large cache of guns and drugs in his house, from which he ran his drug trafficking operation.  Because the defendant cannot rebut the presumption of dangerousness and all four statutory factors weigh in favor of detention, the government respectfully requests that this Court detain him pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

Dated: August 27, 2024          By:     /s/ *Paul V. Courtney*
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1719
Paul.Courtney@usdoj.gov

28