**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-CR-378 (TNM)** |
| **FREDDIE LEE HALL, JR.,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. The defendant, Freddie Lee Hall, Jr., is before this court after pleading guilty to one count of Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(l)(A)(i). For the reasons that follow, the United States respectfully requests that the court sentence the defendant to a term of 71 months' imprisonment. This sentence is an upward variance from the guidelines range. In addition, the government is asking for five years of supervised release.

## I.     FACTUAL BACKGROUND

The factual proffer to which the defendant agreed as part of his February 13, 2025, guilty plea establishes the following uncontested facts:

Between April 3, 2024 and August 15, 2024, in Southeast Washington, D.C., the defendant distributed quantities of cocaine base to a confidential informant working with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) during 13 separate controlled purchase transactions, as set forth in the below table. Each transaction was captured on video. The confidential informant made the purchases using ATF funds. For each transaction, the ATF

1

scanned the currency using a money counter that records the serial number of each bill for subsequent comparison. The Drug Enforcement Administration (DEA) conducted laboratory testing on the drugs from each of the 13 controlled purchases and confirmed that, for each transaction, the substance the defendant distributed to the confidential informant was in fact cocaine base; the quantities in the table below represent the DEA laboratory weight.

| # | Date of Controlled Purchase | Quantity of Cocaine Base the Defendant Distributed |
|---|---|---|
| 1 | April 3, 2024 | 13.52 grams |
| 2 | April 17, 2024 | 27.29 grams |
| 3 | April 19, 2024 | 53.6 grams |
| 4 | April 25, 2024 | 53.51 grams |
| 5 | April 29, 2024 | 53.31 grams |
| 6 | May 23, 2024 | 51.04 grams |
| 7 | May 29, 2024 | 53.48 grams |
| 8 | June 5, 2024 | 54.73 grams |
| 9 | June 12, 2024 | 80.88 grams |
| 10 | June 26, 2024 | 77.67 grams |
| 11 | July 10, 2024 | 81.98 grams |
| 12 | July 25, 2024 | 80.96 grams |
| 13 | August 15, 2024 | 106.22 grams |

Following these controlled purchase transactions, on August 20, 2024, a grand jury empaneled by the U.S. District Court for the District of Columbia returned an indictment charging the defendant with thirteen counts of unlawful distribution of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 84l(a)(l), (b)(l)(C).

On August 20, 2024, the confidential informant arranged to purchase cocaine base from the defendant in Southeast Washington, D.C., on the afternoon of August 22, 2024.

On August 21, 2024, a magistrate judge of the U.S. District Court for the District of Maryland issued a search warrant for the defendant's residence at 8001 Carmel Drive in District Heights, Prince George's County, Maryland.

On the morning of August 22, 2024, ATF Special Agents arrested the defendant in Northwest Washington, D.C., and executed the search warrant at his residence in Maryland. At the time of the search warrant execution, the defendant's significant other and their 12-year-old son were at home. (Although the defendant's father is listed as a co-owner of the home, he does not live at the residence.) The defendant's significant other stated that the basement was the defendant's area. She also informed Special Agents that the defendant had a gun concealed on top of an air duct in the basement and that there was a shotgun behind the master bedroom door. In total, Special Agents recovered seven firearms: five from a gun safe in the basement; one from above the air duct in the basement; and one from behind the master bedroom door.

During the search, Special Agents observed what appeared to be freshly made cocaine base drying on paper towels on a bed in a basement bedroom – evidence that was consistent with the defendant's agreement to distribute cocaine base to the confidential informant in Southeast Washington, D.C., later that afternoon. Numerous articles of the defendant's clothing were observed in this bedroom.

Special Agents recovered substantial evidence of drug trafficking from the basement. This includes a large quantity of marijuana; 547.7 grams of cocaine powder; 71.86 grams of cocaine base; a station for the manufacture of cocaine base (containing, among other things, a microwave, gloves, and baking soda); approximately 2 pounds of suspected mushrooms; drug packaging

material; scales; a money counter; and approximately $61,763.50 in U.S. currency. ATF Special Agents scanned the currency using a money counter and determined, based on serial number comparison, that that approximately $8,400.00 was currency that the confidential informant had paid to the defendant during the controlled purchases described above.

The currency and a bag of powder cocaine were recovered from the gun safe, which was located next to the station for manufacturing cocaine base. The safe also contained five firearms: a loaded privately made firearm (i.e., a "ghost gun"); a loaded Ruger P89 pistol; a loaded Taurus GX4 pistol with obliterated serial number; a box containing a Ruger P95 pistol and loaded magazine; and a loaded American Tactical AR pistol with obliterated serial number. Special Agents also recovered nearly 1,400 rounds of ammunition; approximately 17 firearm magazines of assorted types (e.g., pistol, extended, drum, rifle, shotgun); and other assorted firearm parts and paraphernalia.

From on top of the basement air duct, Special Agents recovered a loaded Ruger LC9 pistol. From behind the master bedroom door, on an upper level, Special Agents recovered a Panzer BP12 shotgun.

Following the defendant's arrest, ATF Special Agents executed a warrant to seize a sample of the defendant's saliva from inside his cheek (i.e., a buccal swab). They explained to the defendant that this was so that they could test the seized firearms for the presence of the defendant's DNA The defendant responded, "I can tell you, ma'am, my DNA is on them."

The defendant possessed the above-described firearms in furtherance of drug trafficking crimes that he committed, and intended to commit, in the District of Columbia and elsewhere, including but not limited to unlawful distribution of, and unlawful possession with intent to distribute, a mixture and substance containing a detectable amount of cocaine base, in violation of

4

21 U.S.C. § 84l(a)(l), (b)(l)(C).

## II.    PROCEDURAL HISTORY

On August 20, 2024, a federal grand jury returned a thirteen-count indictment, charging Freddie Lee Hall, Jr., with Unlawful Distribution of a Mixture and Substance Containing a Detectable Amount of Cocaine Base, in violation of 21 USC §§ 841(a)(1) and (b)(1)(C) (Counts 1 through 13).

On February 13, 2025, the United States Attorney's Office for the District of Columbia filed a one-count Superseding Information, charging the defendant with Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 USC § 924(c)(1)(A)(i). That same day, the defendant pled guilty pursuant to a negotiated agreement. Under the agreement, the defendant pled guilty to Count One of the Superseding Information in exchange for the government agreeing to cap its sentencing recommendation to 71 months' imprisonment.

## III.    LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
        (i) issued by the Sentencing Commission ...; and
        (ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –
    (A) issued by the Sentencing Commission ... and
    (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## IV.   UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES

### A.  The Sentencing Guidelines do not provide an offense level

Because your client is pleading guilty to one count of 18 U.S.C. § 924(c), the Sentencing Guidelines do not provide an offense level; rather, "the guideline sentence is the minimum term of imprisonment required by statute." USSG §2K2.4(b). Accordingly, the guideline sentence in this case is a term of 5 years' imprisonment. 18 U.S.C. § 924(c)(l)(A)(i).

### B.  The Defendant's Criminal History Category is I

The government concurs with Probation's assessment of the defendant's criminal history, as set forth in the PSR. U.S.S.G. § 4A1.1 governs the calculation of a defendant's criminal history for Guidelines' purposes. Section 4A1.1 assigns "points" for each of defendant's prior sentences of imprisonment; the number of criminal history "points" assigned to each sentence depends on the severity of the sentence and when it was imposed. U.S.S.G. §§ 4A1.1(a)-(d). As reflected in the PSR, the defendant's total criminal history score is zero (0), establishing a criminal history category of I.

### V.  THE GOVERNMENT'S SENTENCING RECOMMENDATION

The crime at issue here merits 71 months of incarceration. In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; and the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B).

### A.  Nature and Circumstances of the Offense

The nature and circumstances of this offense are serious and warrant a very lengthy sentence of imprisonment.

Distributing crack cocaine is "a serious offense that begets violence and poisons the community." *United States v. Jackson*, 468 F. Supp. 3d 59, 69 (D.D.C. 2018) (McFadden, J.). Cocaine is destructive due to its "strong addictive potential." *Dep't of Justice / Drug Enforcement Admin.*, Drug Fact Sheet: Cocaine (Oct. 2022), https://www.dea.gov/sites/default/files/2023-03/Cocaine%202022%20Drug%20Fact%20Sheet.pdf. Smoking cocaine—the way crack is ingested—causes a quicker high because the substance reaches the brain "in seconds." *Id.* "Cocaine users often binge on the drug until they are exhausted or run out of cocaine." *Id.*  In

addition, "[t]aking high doses of cocaine or prolonged use, such as binging, usually causes paranoia," and the crash following cocaine use leaves users "craving to use cocaine again." *Id.*

In addition to the fact that crack destroys the lives of the people who become addicted to it, drug distribution is dangerous because it is inherently violent. For obvious reasons, drug dealers cannot rely on law enforcement or the legal system, so they must defend themselves and resolve disputes through the actual or threatened use lethal force. Given that they operate outside the protection of law, drug dealers are also prime targets for robberies, which heightens the risk of lethal force being used by everyone involved.

It thus comes as no surprise that the defendant was found to have a small arsenal in his home, keeping seven guns and nearly 1,400 rounds of ammunition alongside his drug operation. The defendant possessed an overwhelming amount of firepower.[1] Photos of the recovered firearms are included below.

---

[1] In total, Special Agents recovered seven firearms: five from a safe in the basement; one from above the air duct in the basement; and one from behind the master bedroom door.



*Loaded 9-millimeter pistol (from safe)*



*Loaded Ruger P89 9-millimeter pistol (from safe)*



*Loaded Taurus GX4 9-millimeter pistol with obliterated serial number (From safe)*



*Ruger P95 (in box) with loaded magazine (from safe)*



*Loaded American Tactical AR pistol with obliterated serial number (from safe)*



*Loaded Ruger LC9 9-millimeter pistol (from on top of basement air duct)*



*Panzer BP12 12-gauge shotgun (from master bedroom)*

As mentioned above, five firearms were recovered from a safe, which is depicted below.



In addition to the recovered firearms and the nearly 1,400 rounds of ammunition, Special Agents recovered approximately 17 firearm magazines of assorted types (e.g., pistol, extended, drum, rifle, shotgun); various other firearm parts and paraphernalia; and body armor.

Special Agents also recovered substantial evidence of drug trafficking. This includes a large quantity of marijuana; approximately 547.7 grams of cocaine powder; approximately 71.86

grams of cocaine base; approximately two pounds of suspected mushrooms; drug packaging material; scales; a money counter; and nearly $62,000 in cash.





There was also evidence that the defendant manufactured crack in the basement. Next to the safe was a microwave, gloves, and baking soda. In addition, Special Agents saw what appeared to be freshly made crack cocaine drying on paper towels on a bed in a basement bedroom. Numerous articles of the defendant's clothing were observed in this bedroom.



As a threshold matter, judges of this court have repeatedly recognized that, even in the absence of drug activity, possession of a loaded handgun is an inherently dangerous act that places the community at risk. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence"). In the hands of those who are dealing drugs, however, guns pose an even greater risk to community safety. *See, e.g.*, *Muscarello v. United States*, 524 U.S. 125, 132

(1998) (recognizing the "dangerous combination" of "drugs and guns") (quoting *Smith v. United States*, 508 U.S. 223, 240 (1993)).

Although no one was seriously injured by the defendant's conduct, his actions are serious. The defendant wasn't some low-level dealer, selling small quantities of drugs on the street. The quantities of drugs found at his home and that he admitted to selling suggested that he is a significant supplier. Here, there is evidence that the defendant manufactured crack, and when he pled guilty he admitted selling approximately 788.19 grams of it to just one ATF informant. At the time of his arrest, he had approximately 18.8 grams of crack on his person, and a substantial quantity of additional drugs at his home—including approximately 547.7 grams of cocaine powder and approximately 71.86 grams of cocaine base. *See United States v. Holroyd*, No. 17-234, 2018 WL 294529, at *2 (D.D.C. Jan. 4, 2018) (finding that approximately 20 grams of cocaine recovered from the defendant's apartment was a "substantial quantity" that posed a significant danger to communal safety).

On top of that, the defendant—a convicted felon—possessed seven firearms (one of which was a ghost gun and two of which had obliterated serial numbers) and thousands of rounds of ammunition in furtherance of his drug trafficking activity, an activity which courts have noted is dangerous to the community.

The defendant's actions are serious, dangerous, and justify a lengthy prison sentence.

**B.  The History and Characteristics of the Defendant**

As set forth in the Pretrial Services Report, the defendant has a long criminal history, including two prior (albeit dated) felony drug trafficking convictions involving cocaine. In 1991, the defendant pled guilty to Attempted Distribution of Cocaine. In 1999, the defendant pled guilty to a second drug offense – Distribution of Cocaine. While the defendant's previous drug

distributions are older, they are still relevant for the purposes of sentencing. They are evidence that the defendant has not learned from his past experiences despite knowing that selling narcotics is illegal. Indeed, the defendant told the CI during the July 25, 2024, controlled purchase that he is always aware of his surroundings because "[t]his shit ain't legal."

### C.  The Need for the Sentenced Imposed to Afford Adequate Deterrence

As noted in the defendant's criminal history and referenced above, the defendant has a very long history of committing criminal acts. Although the defendant's drug convictions are dated, his recent actions show that he is not moved beyond committing crimes. Most people the defendant's age have aged out of committing crimes, and thus are no longer a danger to the community. However, based on the defendant's action it is clear that he has not learned his lesson as he is still trafficking drugs at the age of 57. The court should impose a sentence of 71 months to drive home the message that the defendant should stop committing crimes.

### CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the court sentence Defendant Freddy Hall, Jr. to 71 months' imprisonment, to be followed by five years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: _____ /s/ *Jared English* _____
JARED ENGLISH
Assistant United States Attorney
D.C. Bar No. 1023926
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-465-0089
Email: Jared.English@usdoj.gov

17